IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PATRICE MANSELL | : | |
| D/B/A MANSELL'S CARGO | : | |
| UNLOADING | : | Civil Action No. CCB-08-2287 |
| | : | |
| v. | : | |
| | : | |
| TOYS "R" US, INC. | : | |

…o0o…

## MEMORANDUM

Now pending before the court are cross motions for summary judgment. Plaintiff Patrice Mansell, d/b/a Mansell's Cargo Unloading (hereinafter "MCU"), sued defendant Toys "R" Us, Inc. (hereinafter "TRU") for breach of contract, tortious interference with contract, and discrimination under 28 U.S.C. § 1981 (hereinafter "§ 1981"). The plaintiff's claims arise out of an agreement whereby MCU provided trailer unloading services to TRU at its distribution facility in Frederick County, Maryland. TRU moved for summary judgment on all three of Mr. Mansell's claims, and Mr. Mansell moved for summary judgment on counts one and two. The issues in this case have been fully briefed and no oral argument is necessary. For the following reasons, the defendant's motion for summary judgment will be granted and the plaintiff's motion will be denied.

## BACKGROUND

Mr. Mansell is the sole proprietor of MCU, which is located in Frederick, Maryland. MCU is in the business of providing manpower for loading and unloading trailers to freight handling facilities in central Maryland. TRU is a worldwide retail toy store. It is a Delaware corporation, which has its principal place of business in New Jersey. TRU has a shipping and

receiving distribution center in Frederick, Maryland, at which MCU provided services from 2003 until 2007.

*A.     The Parties' Agreement*

The parties began a business relationship in early 2003, after Mr. Mansell approached Pierre Jackson, a manager at the TRU distribution facility, about the possibility of providing trailer unloading services to the TRU facility. Mr. Jackson then discussed Mr. Mansell's offer to do business with Michael Gibson and John Longino, the distribution center's operations managers. At some point during these discussions, but before MCU did any work for TRU, Mr. Mansell hand-delivered a letter to Mr. Gibson with an attached pricing schedule ("the proposal"). (Mansell Dep. at 323-24, Jan. 8, 2009 & March 23, 2009.) The proposal, dated April 16, 2003, stated in part:

> If you find this offer acceptable and wish to begin a work relationship with M.C.U. there are two other items that have to be agreed upon as part of this offer to do work. # 1. timelyness [sic] of pay, two weeks from date of invoice and #2. Toys "R" Us agrees not to do business with any employees of Mansell's Cargo Unloading during the course of our relationship and for a period of 3 years after the end of our relationship.

(Proposal, attached to Def.'s Summ. J. Mem. as Ex. 3.) The parties never executed a written contract following Mr. Mansell's proposal. Nevertheless, MCU began providing unloading services to TRU in April 2003, and continued to do so until January 2007.

Although the parties agree that Mr. Gibson orally accepted Mr. Mansell's proposed pricing schedule, they disagree as to whether he accepted the two additional terms relating to payment schedule and doing business with MCU employees. It is Mr. Mansell's position that Mr. Gibson agreed to all the proposal's terms. Mr. Mansell testified that within a week of delivering the proposal, Mr. Gibson called him and invited him to do work for TRU. (Mansell Dep. at 293: 17-19.) When asked whether Mr. Gibson accepted the proposal, Mr. Mansell

responded: "Yes, sir. He agreed with the proposal, and he gave me a start date to work. He accepted the proposal." (*Id*. at 292: 20-22.) But Mr. Mansell acknowledged that he never received anything in writing from TRU agreeing to the proposal's additional terms. (*Id*. at 326: 9-19.) When further asked whether Mr. Gibson told him that TRU corporate would be reviewing the proposal, Mr. Mansell testified: "I'm not sure. I believe he mentioned something about sending it to corporate, but I don't know if his intention was for them to reapprove it. But he had already approved it himself for me to begin work." (*Id*. at 325: 1-5.)

By contrast, it is TRU's position that Mr. Gibson agreed only to the pricing schedule, but not to the proposal's additional terms. When asked whether he accepted Mr. Mansell's proposal, Mr. Gibson testified that he "[a]ccepted the rates, yes". (Gibson Dep. at 11: 4, March 25, 2009.) As to the rest of the proposal, Mr. Gibson stated that, "I never told Mr. Mansell that the entire proposal was acceptable. In fact I specifically advised him that the payment schedule and hiring of employee clauses was unacceptable." (Gibson Aff. at ¶ 12.) Mr. Gibson further stated that, "Mr. Mansell was advised however that the proposal still had to be reviewed by Toys "R" Us' Corporate Offices who would then issue a formal vendor contract." (*Id*. at ¶ 9.) But the parties agree that no formal vendor contract or written agreement was ever issued or executed.[1] (*Id*. at ¶ 11; Mansell Dep. at 85: 13-19.)

There is no evidence that TRU paid MCU on a two-week schedule at any time during the parties' four-year course of dealing. Jeffrey Sonnenberg, the General Manager of the TRU

---

[1] There is also evidence that in December 2005, MCU and TRU discussed the possibility of MCU expanding its services to the "other side" of the distribution center. (*See* Mansell Dep. at 64.) Mr. Mansell testified that he and Sheila Edwards, a TRU human resources employee, signed an agreement regarding such services, but that it was ultimately rejected by the corporate office because of addendums he had added. (*Id*. at 70; 140-141.) The December 2005 agreement included a clause prohibiting TRU from doing business with MCU employees in the future. (*Id*. at 74.) But after the corporate office rejected the agreement, the additional work on the other side of the distribution center never occurred. (*Id*. at 71: 8-14.)

Maryland distribution center, stated that MCU was paid on the same timetable as all other TRU vendors – thirty days from the date of invoice receipt – and that MCU was never given a payment schedule of fifteen days. (Sonnenberg Aff. at ¶ 4-5.) MCU has submitted no evidence to the contrary.

Throughout the parties' relationship, TRU contacted MCU on a regular basis to explain its upcoming staffing needs, which fluctuated based on the season. Generally, someone from TRU would call either Mr. Mansell or Javier Hereaux,[2] a supervisor at MCU, to indicate how many workers TRU needed for the next week. Some months were slower than others, and January was typically a "layoff season" after the holiday rush, during which MCU workers would be on break. (Mansell Dep. at 195: 18-19; 203: 13-20.)

B.     *Mr. Mansell's Access Card*

TRU issued access cards ("badges") to Mr. Mansell and his employees so they could enter the TRU distribution facility. The badges typically remained active throughout the year unless an MCU employee was terminated or was not working during the layoff season. (*Id*. at 89-90.) In November 2006 Mr. Mansell began having problems with his badge and was unable to enter the facility using it. Nevertheless, he was still able to access the distribution center because the security personnel knew him and would open the gate for him. (*Id*. at 93: 9-13.) Mr. Mansell testified that he mentioned the problem with his badge to TRU supervisors (*id*. at 94: 11-17), and he implied that TRU deactivated the badge on purpose because they disliked him. (*See id*. at 173-74.) Mr. Mansell continued to work at TRU despite the deactivated badge. (*Id*. at 96: 16-18.) It is TRU's position that the deactivation of Mr. Mansell's badge was accidental. (Hartsell Dep. at 16: 13-15, March 24, 2009.)

---

[2] The spelling of Mr. Hereaux's last name varies among the parties' papers and attachments. The court has used that which appears in his affidavit.

*C.*     *Termination of the Business Relationship*

The parties ceased doing business in January 2007, but they disagree as to who terminated the relationship. According to Mr. Mansell, TRU fired him because of his race. He testified that he believed this because Mr. Jackson told him that Dan Hartsell and Todd Hatfield, who replaced Mr. Gibson as operations managers at the TRU facility in 2006, "were getting rid of [him] because of [his] race" (Mansell Dep. at 157: 6-7), and Joseph Brodrick-Okereke,[3] another TRU employee, told him that upper management disliked him because of his race.[4] (*Id*. at 168-69.) He also stated that he believed that the managers at TRU were "actively seeking to get rid of me and my people . . . when they cancelled my badge." (*Id*. at 173-74.) But he never testified that the cancellation of his badge had anything to do with his race.[5] In addition, Mr. Mansell stated that MCU did work for TRU through the first or second week in January 2007 (*id*. at 119: 7-10), at which point people at TRU told him things were slow and they would call him when MCU services were needed again in the new season. (*Id*. at 119: 17-19; 204: 2-6.) But no one from TRU ever told Mr. Mansell that he was fired. (*Id*. at 120: 2-3.)

According to TRU, on the other hand, the business relationship ended because Mr. Mansell refused to do any more work for the company. Mr. Hartsell testified that he told Mr. Mansell in January 2007 that it was a slow period and "it would be another period of time before we would have enough work for his team to come back." (Hartsell Dep. at 17: 4-8.) In February

---

[3] The spelling of Mr. Brodrick-Okereke's last name varies among the parties' papers and attachments. The court has used that which appears in his deposition transcript.

[4] In their depositions, Mr. Jackson and Mr. Brodrick-Okereke denied having told Mr. Mansell anything of the kind. (Brodrick-Okereke Dep. at 38-39, March 24, 2009; Jackson Dep. at 28-29, March 19, 2009.)

[5] Mr. Mansell also testified that Mike Rautzhan, another TRU employee, told him that Mr. Hartsell and Mr. Hatfield did not like him. According to Mr. Mansell, however, Mr. Rautzhan never said that it was because of his race. (Mansell Dep. at 175: 7-13.)

5

2007 Mr. Brodrick-Okereke contacted Mr. Hereaux to request that MCU send fifteen workers to the TRU facility, but Mr. Hereaux told him that Mr. Mansell was not going to send any more men unless he talked to higher management. (Brodrick-Okereke Dep. at 29-32; Hereaux Aff. at ¶¶ 6-8.) Mr. Mansell admits that he received a call from Mr. Brodrick-Okereke in February 2007 indicating that TRU needed MCU workers (Mansell Dep. at 233: 18-21; 234: 10-13), and he testified that he told Mr. Brodrick-Okereke to have Mr. Hartsell call him to discuss the matter (*id*. at 307: 14-20), but he also testified that he never told Mr. Hereaux or Mr. Brodrick-Okereke that MCU would not provide services. (*Id*. at 236: 1-9.) He does not dispute, however, that he never sent any workers following TRU's request. (*Id*. at 236: 10-11.) After February 2007 no one from TRU contacted Mr. Mansell about work again, and the parties' relationship ended.

### D.     MCU Workers

The number of individuals employed by MCU varied based on the amount of work MCU had available. Many workers also had other jobs when business was slow at MCU (*id*. at 36: 2-5), and Mr. Mansell had a "very long list of workers" that he would go through to make calls whenever he needed laborers. (*Id*. at 33: 9-19.) Mr. Mansell testified that by the end of 2006, and while he had a contract with TRU, there were approximately fifteen men working exclusively for MCU. (*Id*. at 37: 4-8.) Although he has referred to those who worked for him as "employees", all MCU workers were required to sign a document titled "Mansell's Cargo Unloading Subcontractor Agreement" which stated that a "[s]ubcontractor is a self-employed, subcontract laborer, not an employee." (*Id*. at 50: 12-20; *see* Subcontractor Agreement, attached to Def.'s Summ. J. Mem. as Ex. 19 at ¶ 2.) Once an individual signed this document, Mr. Mansell would contact him whenever work became available. (Mansell Dep. at 50: 12-15.) The MCU Subcontractor Agreement also included a non-compete clause:

6

> Subcontractor agrees not to provide, or contract to provide, or to agree to provide freight handling services directly for or to any MCU customer while he/she is an MCU subcontractor and for a period of five (5) years from the time that Subcontractor terminates his/her relationship with MCU. Subcontractor will not directly or indirectly assist another person or entity in providing or contracting to or agreeing to provide freight handling service to any customer of MCU.

(Def.'s Summ. J. Mem. Ex. 19 at ¶ 5.) MCU primarily employed Spanish-speaking workers, many of whom were foreign nationals. Although the agreement was in English, Mr. Mansell, who speaks Spanish, testified that he translated its terms before the workers signed it. (Mansell Dep. at 56: 12-19.)

Mr. Mansell alleges that several former MCU workers continued to work at the TRU distribution facility even after TRU and MCU ceased doing business in early January 2007. He testified that he took his crew to work at other warehouses during the remainder of January 2007 (*id*. at 205: 7-16), but at some point, his men stopped working for MCU. Mr. Mansell is unsure, however, of when they left. (*Id*. at 119: 406; 126: 1-6.) He also is unsure of many of their names, as some of them allegedly changed their names in the past few years. Although Mr. Mansell is certain that many of his former workers now work at the TRU facility, he does not know if they work for TRU directly. (*Id*. at 128: 10-11; *see also id*. at 185-192.) Several former MCU workers, including Mr. Hereaux, stated that they currently work for PLS, a company now providing unloading services to the TRU distribution facility. (Choc Aff. at ¶¶ 3-4; Cruz Aff. at ¶¶ 4-5; Hereaux Aff. at ¶¶ 10-12; Lopez Aff. at ¶¶ 3-4; Raudales Aff. at ¶¶ 3-4; D. Rubi Aff. at ¶¶ 3-5; J. Rubi Aff. at ¶¶ 3-4; Zepeda Aff. at ¶¶ 3-4.)[6] In addition, these workers stated that they stopped working at MCU because there was not enough work to keep them busy, and that they have never worked directly for TRU. (Choc Aff. ¶¶ 2, 5; Cruz Aff. at ¶¶ 2, 6; Lopez Aff. at ¶¶ 2, 5; Raudales Aff. at ¶¶ 2, 5; D. Rubi Aff. at ¶¶ 2, 6; J. Rubi Aff. at ¶¶ 2, 5; Zepeda Aff. at ¶¶ 2, 5.)

---

[6] All affidavits of former MCU workers were submitted in Spanish with an English translation attached.

In July 2008 Mr. Mansell filed the present lawsuit against TRU alleging three causes of action. First, he alleges that TRU breached its contract with him because it hired MCU employees after the parties ceased doing business. Second, he alleges that by hiring MCU employees, TRU tortiously interfered with the subcontractor agreements that Mr. Mansell had with each of them. Last, Mr. Mansell alleges that TRU discriminated against him in violation of § 1981 because it terminated the contract between them on account of his race (African American). TRU moved for summary judgment on all three of Mr. Mansell's claims. Mr. Mansell filed a cross motion for summary judgment as to counts one and two.

## **ANALYSIS**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). In cases involving contract disputes, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

8

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

A.      *Breach of Contract*

Mr. Mansell alleges that TRU breached its contract with MCU by hiring MCU employees after the parties ceased doing business in January 2007. TRU argues that it is entitled to summary judgment because Mr. Mansell's April 16, 2003 proposal did not constitute a binding contract and, even if it had, Mr. Mansell cannot prove breach of contract. For the reasons described below, the court will grant TRU's motion for summary judgment on this claim.

The parties disagree whether Mr. Gibson accepted only the pricing schedule attached to Mr. Mansell's proposal, or whether he also accepted the two additional items pertaining to a two-week payment schedule and doing business with MCU employees. It seems very unlikely that TRU accepted the additional items given the lack of dispute that throughout their four-year business relationship, TRU always paid Mr. Mansell on a thirty-day schedule. But even assuming without deciding that TRU accepted the entirety of Mr. Mansell's proposal, TRU cannot be liable for breach of contract because, according to the MCU Subcontractor Agreement, MCU workers were independent contractors and not employees.

The construction of written instruments is initially a question of law to be determined by the court. *Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1075 (Md. 1991) (internal quotation marks and citations omitted). It is well-established in Maryland that where there is an ambiguity in a document, that language is to be strictly construed against the party that drafted it because the drafter had the "better opportunity to understand and explain his meaning." *Id.* (internal quotation marks and citations omitted). Where there was an ambiguity as to the geographical and time limitations of a noncompetition clause in an employment contract governed by Maryland law, the Fourth Circuit found that "[s]ince it was drafted by [the plaintiff] it should be strictly construed against that party." *Conwell & Co. v. Gutberlet*, 429 F.2d 527, 528 (4th Cir. 1970); *see also Hebb v. Stump, Harvey & Cook, Inc.*, 334 A.2d 563, 567 (Md. App. 1975) (stating that a covenant not to compete must be construed against the drafting party where there is an ambiguity).

Here, the restrictive covenant drafted by Mr. Mansell stated the following: "Toys "R" Us agrees not to do business with any *employees* of Mansell's Cargo Unloading during the course of our relationship and for a period of 3 years after the end of our relationship." (Def.'s Summ. J. Mem. Ex. 3) (emphasis added). Construing the covenant strictly, the word "employees" does not include independent contractors. Although Mr. Mansell argues that the covenant is applicable here, it is undisputed that he required all MCU workers to sign a contract titled "Mansell's Cargo Unloading Subcontractor Agreement" that included the following clause: "Subcontractor is a self-employed, subcontract laborer, not an employee." (Mansell Dep. at 50: 12-20; Def.'s Summ. J. Mem. Ex. 19 at ¶ 2.) Mr. Mansell also testified that he was uncertain as to what to call his workers because: "I have guys that have worked for me for five years, but in some instances they work for me five days a week for months, and then in other instances, for a couple of

months they only work with me one day a month." (Mansell Dep. at 34: 1-6.) Because Mr. Mansell admits to having made his workers agree in writing not to be called employees, he cannot now succeed in a breach of contract claim against TRU for doing business with MCU "employees". Put simply, even if TRU agreed to the entirety of Mr. Mansell's proposal, and later did business with his independent contractors, [7] TRU cannot, as a matter of law, have breached their agreement. Accordingly, TRU is entitled to summary judgment on Mr. Mansell's breach of contract claim.

B.   *Tortious Interference with Contract*

Mr. Mansell further alleges that TRU hired MCU workers after the end of the parties' business relationship and, therefore, tortiously interfered with subcontractor agreements that included five-year covenants not to compete. For the following reasons, TRU is also entitled to summary judgment on this claim.

To establish a *prima facie* case of tortious interference with contract, a plaintiff must show: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract; (4) breach of the contract by the third party; and (5) resulting damages to the plaintiff. *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. App. 1991). As a threshold matter, a claim for tortious interference with contract is not cognizable unless there is a valid agreement that is "not illegal as in restraint of trade, or otherwise opposed to public policy, so that the law will not aid in upholding it." *Fraidin v. Weitzman*, 611 A.2d 1046, 1057 (Md. App. 1992) (internal quotation

---

[7] Mr. Mansell has presented no evidence that TRU directly hired any of his workers. Several former MCU workers stated that they currently work for PLS, a company now providing unloading services to the TRU distribution facility. (Choc Aff. at ¶¶ 3-4; Cruz Aff. at ¶¶ 4-5; Hereaux Aff. at ¶¶ 10-12; Lopez Aff. at ¶¶ 3-4; Raudales Aff. at ¶¶ 3-4; D. Rubi Aff. at ¶¶ 3-5; J. Rubi Aff. at ¶¶ 3-4; Zepeda Aff. at ¶¶ 3-4.)

marks omitted) (citing W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 129 at 994-95 (5th ed. 1984)).

TRU's primary argument is that the restrictive covenant contained in the MCU Subcontractor Agreement is invalid as a matter of law. Restrictive covenants in employment contracts are in restraint of trade, and their validity depends on their reasonableness. *Ruhl v. Bartlett Tree Co.*, 225 A.2d 288, 291 (Md. 1967). In Maryland, a covenant not to compete may be sustained only if "the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Id*. (internal quotation marks and citation omitted). Where the scope of a particular covenant is not too broad on its face, the facts and circumstances of each case must be examined. *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973) (internal citation omitted). Although an employer generally has a protectable business interest where it seeks to prevent an employee "from using the contacts established during employment to pirate the employer's customers," *Holloway v. Faw, Cason & Co.*, 572 A.2d 510, 515 (Md. 1990), covenants not to compete may be applied only to those "employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers." *Becker*, 299 A.2d at 838.

Unique or specialized skills or services are those "that would make it difficult to find a substitute employee." *Ecology Servs., Inc. v. Clym Envt'l Servs., LLC*, 952 A.2d 999, 1009 (Md. App. 2008) (internal citation omitted). By contrast, skills that are simply acquired "by an employee during his or her employment do not warrant enforcement of a covenant not to compete." *Id*. at 1010 (internal quotation marks and citation omitted). Accordingly, Maryland courts have routinely refused to enforce noncompetition covenants applied to unskilled workers.

*See Becker*, 299 A.2d at 839 (holding that a covenant restricting a tag and title courier from engaging in similar business in the surrounding counties for two years was unenforceable because he was an unskilled worker whose services were not unique and there were no private customer lists or trade secrets); *Budget Rent a Car of Washington, Inc. v. Raab*, 302 A.2d 11, 13-14 (Md. 1973) (finding a restrictive covenant in a rental car franchise agreement unenforceable because a former franchisee was unskilled and there was no solicitation of customers, or use of trade secrets or assigned routes); *see also Ecology*, 952 A.2d at 1013 (holding that non-competition covenants restricting waste management specialists with higher degrees was unenforceable in large part because they did not possess unique or specialized skills); *cf. Millward v. Gerstung Int'l Sport Edu., Inc.*, 302 A.2d 14, 17 (Md. 1973) (holding that a noncompetition covenant was reasonable because of the "uniqueness of [the former employee's] reputation and qualifications").

The restrictive covenant at issue here is invalid under Maryland law because it is unreasonable in its application to unskilled workers.[8]  The MCU Subcontractor Agreement prohibits a subcontractor from: "provid[ing], or contract[ing] to provide, or to agree[ing] to provide freight handling services directly for or to any MCU customer while he/she is an MCU

---

[8] The restrictive covenant is also overbroad in its duration, as five-year non-compete clauses rarely have been upheld by Maryland courts.  The critical inquiry is, "[a]fter what period of time will the customer cease to be influenced by the personal relationship the employee was able to form while in the employ of his employer?" *Holloway*, 572 A.2d at 523 (holding that it was unreasonable to restrict an accountant from doing business with his former employer's clients for a period of five years because after three years any business with such clients would result from his competitive efficiency and not the relationships he forged while an employee); *see also Tawney v. Mut. Sys. of Maryland*, 47 A.2d 372, 379 (Md. 1946) (holding that a two-year restrictive covenant in a small loan manager's employment contract was unenforceable because it "sought to enforce a restriction beyond the time when new employees might reasonably become acquainted with existing customers").  Here, where MCU simply arrived daily at the customer location to unload trailers, personal relationships never existed between MCU workers and MCU customers.  Thus, there is little question that five years is an unreasonably long period of time to restrict the future employment of MCU workers as it cannot possibly take five years for customers to cease being influenced by relationships that never existed in the first place.

subcontractor and for a period of five (5) years from the time that the Subcontractor terminates his/her relationship with MCU." (Def.'s Summ. J. Mem. Ex. 19 at ¶ 5.) MCU workers, however, do not have unique skills or reputations, nor would they be difficult to replace. In fact, Mr. Mansell testified that he had a "very long list of workers" that he would go through whenever he needed laborers. (Mansell Dep. at 33: 9-19.) Furthermore, MCU workers are neither in possession of confidential information or trade secrets, nor do they manage customer lists or fixed routes. Just as the Maryland Court of Appeals found that a tag and title courier and a rental car franchisee were unskilled workers to whom noncompetition covenants should not apply, *see Becker*, 299 A.2d at 839; *Budget*, 302 A.2d at 13-14, here, the court finds that individuals hired exclusively to unload trailers are unskilled workers to whom Maryland law prohibits the application of a restrictive covenant. Moreover, any additional skills or efficiencies learned by MCU workers on the job do not by themselves warrant the application of a covenant not to compete.

Thus, no valid restrictive covenant existed between MCU and the workers who signed the MCU Subcontractor Agreement. Accordingly, TRU cannot be liable for tortious interference with contract and is entitled to summary judgment on this claim.

C.   *Race Discrimination*

Mr. Mansell's final claim is that TRU terminated its contractual relationship with MCU because of his race in violation of § 1981. The court will grant TRU's motion for summary judgment as to this claim.

Pursuant to § 1981, all persons within the jurisdiction of the United States have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." § 1981(a). To make and enforce contracts" is defined as the "making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Thus, to prove a § 1981 claim, a plaintiff must establish that: (1) "the defendant intended to discriminate on the basis of race," and (2) "the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006) (internal citations omitted). A plaintiff need not prove breach of the underlying contract to prove a § 1981 claim, nor, on its own, is proof of a breach sufficient to prove such a claim. *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1020 (4th Cir. 1999). Therefore, a defendant may terminate a contract without breaching it, but "may still violate § 1981 if that action is racially discriminatory and affects one of the contractual aspects listed in § 1981(b)." *Id.*

Where there is no direct evidence of discrimination, a § 1981 plaintiff must "proffer sufficient circumstantial evidence to satisfy the familiar *McDonnell Douglas* analytical framework." *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004) (internal citation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, to defeat a defendant's motion for summary judgment a plaintiff must first make out a *prima facie* case of discrimination.[9] *Williams*, 372 F.3d at 667. If the plaintiff succeeds in carrying out this initial burden, then "the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate that the given reason was a pretext for unlawful discrimination. *Id.* To

---

[9] The elements of a *prima facie* case of race discrimination are the same under Title VII and § 1981. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 n. 1 (4th Cir. 2002) (internal citation omitted).

15

establish a *prima facie* case of race discrimination with regard to termination of an employment contract, a plaintiff must show that: "(1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." [10] *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

Mr. Mansell has failed to present any admissible direct evidence of discrimination and therefore his claim must be analyzed under the *McDonnell Douglas* framework. Mr. Mansell's only direct evidence of discrimination is his testimony that Mr. Jackson told him that TRU managers Mr. Hartsell and Mr. Hatfield, "were getting rid of [him] because of [his] race", (Mansell Dep. at 157: 6-7), and Mr. Brodrick-Okereke told him that upper management disliked him because of his race.[11] (*Id*. at 168-69.) This evidence is not sufficient to survive a motion for summary judgment, however, because it is inadmissible hearsay. *See* Fed. R. Evid. 56(e) ("A supporting or opposing affidavit must . . . set out facts that would be admissible in evidence").

Mr. Mansell argues that such statements are admissible as nonhearsay under Federal Rule of Evidence 801(d)(2)(D), but that rule is inapplicable here because the statements were not made within the scope of Mr. Jackson's or Mr. Brodrick-Okereke's employment. Rule 801(d)(2)(D) states that out of court statements offered for the truth of the matter asserted are nonhearsay admissions by a party-opponent if offered against a party and made "by the party's

---

[10] Although Mr. Mansell was not employed by TRU, he alleges that TRU terminated their contract for his services on account of his race and, therefore, the elements of a *prima facie* case of discrimination are analogous.

[11] Mr. Mansell also testified that his access badge was deactivated because the TRU managers "were actively seeking to get rid of me and my people" (Mansell Dep. at 173-74), but nowhere has he alleged specifically or offered proof that his badge was deactivated because of his race.

agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship". Here, although Mr. Jackson and Mr. Brodrick-Okereke are employees of defendant TRU, they had no decision-making power with regard to MCU's contract and, therefore, the statements about Mr. Hartsell's and Mr. Hatfield's possible bias were not within the scope of their employment. *See Precision Piping & Instruments, Inc. v. DuPont de Nemours & Co.*, 951 F.2d 613, 619-20 (4th Cir. 1991) (affirming that out of court statements made about the bias of another by individuals who did not have authority to "hire and fire" the plaintiff were not within the scope of the declarants' agency); *Staheli v. Univ. of Mississippi*, 854 F.2d 121, 127 (5th Cir. 1988) (holding that an out of court statement about the reasons for the plaintiff's termination made by an employee who had nothing to do with personnel decisions "did not concern a matter within the scope of his agency and was made in his capacity as wiseacre only."); *cf. Equal Employment Opportunity Comm'n v. Watergate at Landmark Condominium*, 24 F.3d 634, 640 (4th Cir. 1994) (holding that out of court statements made by volunteer committee members were nevertheless within the scope of the members' agency because although they were not ultimate decision-makers, their "involvement in the [decision-making] process . . . was palpable"). Accordingly, Mr. Mansell's testimony about the statements allegedly made by Mr. Jackson and Mr. Brodrick-Okereke is inadmissible hearsay and cannot, by itself, constitute direct evidence of discrimination sufficient to defeat the defendant's motion for summary judgment.

Even assuming without deciding that Mr. Mansell has presented a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework, however, TRU is entitled to summary judgment because it has articulated a legitimate, non-discriminatory reason for ceasing to do business with Mr. Mansell: he refused to send his workers when TRU requested

them in February 2007. MCU worked for TRU through the first or second week of January 2007 (Mansell Dep. at 119: 7-10), when people at TRU told Mr. Mansell that business was slow and they would call him when his services were needed again. (*Id*. at 119: 17-19; 204: 2-6.) TRU has presented evidence that in February 2007 Mr. Brodrick-Okereke contacted Mr. Hereaux at MCU requesting that fifteen workers be sent to the TRU facility, but Mr. Hereaux told him that Mr. Mansell was not going to send any more men unless he talked to higher management. (Brodrick-Okereke Dep. at 29-32; Hereaux Aff. at ¶¶ 6-8.) Although Mr. Mansell testified that he never told Mr. Hereaux that MCU would not provide services (Mansell Dep. at 236: 1-9), he admitted that Mr. Brodrick-Okereke contacted him in February 2007 requesting MCU workers (*id*. at 233: 18-21; 234: 10-13), and that he told Mr. Brodrick-Okereke to have Mr. Hartsell contact him. (*Id*. at 307: 14-20.) Moreover, he does not dispute that MCU did not send any workers following Mr. Brodrick-Okereke's request. (*Id*. at 236: 10-11.) After what TRU understood to be MCU's refusal to work in February 2007, it stopped contacting MCU altogether. There is nothing discriminatory about the decision to switch to a different unloading service after MCU refused to provide workers. Mr. Mansell testified that he was aware TRU needed workers, yet he did not meet the demand. He cannot now claim that TRU's decision not to seek out his services in the future was based on race, and he is unable to show that TRU's legitimate, non-discriminatory reason for ceasing to do business with MCU is pretextual. TRU is, therefore, entitled to summary judgment on Mr. Mansell's discrimination claim.

## **CONCLUSION**

For the foregoing reasons, the court will grant the defendant's motion for summary judgment and deny the plaintiff's motion. A separate Order follows.

   December 10, 2009                                             /s/
      Date                                                     Catherine C. Blake
                                                            United States District Judge